The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Mr. Luckett, when you're ready. May it please the Court, my name is Benjamin Luckett and I represent the petitioners. This case comes down to whether the Virginia Department of Environmental Quality and the State Water Control Board adequately considered the water quality impacts of the Mountain Valley Pipeline and rationally concluded that the project would not lead to violations of the Commonwealth's water quality standards. The MVP, as the pipeline is known, is a truly unprecedented construction project. Never before has a pipeline of this size been built through the steep and highly erodible terrain of Virginia's mountains. Uncontroverted expert evidence shows that the clearing of all vegetation within the 125-foot-wide construction corridor and the trenching and blasting required to lay the pipe would lead to substantial and long-term increases in erosion and sedimentation, particularly in areas of steep slopes. The State agencies failed to assess the combined impacts of all of the pipeline's discharges and failed to support their conclusion that Mountain Valley's general, non-site-specific erosion and sedimentation control measures would prevent any lowering of water quality. The record does not support the Board and DEQ's finding of reasonable assurance that the project would not lead to violations of water quality standards, including anti-degradation requirements. The Court should just vacate the certification and remand it to the agency for further review. As an initial matter, plaintiffs have Article III standing to challenge the State's certification. The State does not dispute the petitioners' members' property, recreational, and aesthetic interests in water quality would be harmed by construction of the MVP. Rather, they argue that petitioners lack standing because even if petitioners prevail in this action, the State could ultimately choose to waive its authority on remand such that petitioners' injuries would remain. Now, that argument was foreclosed by the Supreme Court's decision in FEC v. Aikens, which holds that those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision on an improper legal ground. Now, this Court followed Aikens in the 2009 case of Townsville-Jarvis, where it explained that a plaintiff can challenge a discretionary agency action for failure to properly apply the law, even though the agency might reach the same result on remand. The Court explained that to hold other eyes would involve courts in the speculative, if not impossible, task of predicting how an agency might exercise its discretion. Now, here the State has not claimed that it would certainly affirmatively waive its certification authority on remand, only that it has the discretion to do so. And the case law thus establishes that petitioners have standing to challenge the State's affirmative action of certifying that the MVP would not cause violations of State water quality standards. And if you succeed, then what's FERC going to do? Or how do we know what they're going to do? If you succeed in the 401 certification and you get the relief that you seek there, then what's the next step? That would be to remand to the agency for further consideration. We believe that the agency would be required to collect additional information from the company to adequately determine whether or not this project can comply. All right. And then after that, let's suppose you succeed. Then what's after that? What's the next step after that? Well, the State would either certify the project, we would argue requiring additional conditions and protections, or it could deny certification, and thus the project could not go forward. And what effect will that decision have on FERC? FERC cannot authorize the pipeline to proceed without the 401 certification from the State. Section 401 provides States a shield against activities authorized by Federal agencies that could adversely affect their water quality. And as the Second Circuit recently upheld in the Constitution Pipeline case, States are allowed to deny certifications, and that denial would prevent the construction of a FERC-authorized pipeline. So in this case, either the State on remand would issue a new certification with additional protective conditions or it would deny the certification. And indeed, this certification should be vacated and remanded, particularly in light of the State's fundamental failure to analyze the combined impacts of all of the project's discharges. A State erred here by looking at the impacts associated with so-called upland discharges completely in isolation of the impacts associated with the pipeline's crossings of wetlands and water bodies. And those crossings are authorized by the U.S. Army Corps of Engineers Clean Water Act Section 404 Nationwide Permit 12. But a State disagreed. It said that looking at these things separately fulfilled their duty in terms of, and you said it should have been looked at together, but they say otherwise, looking at the upland and then also looking at, as you say, the crossings and the wetlands and streams, that was sufficient. What's the standard review in that in terms of standoff? What standard should we use as a court? Well, the State here is making a legal determination about what is required by Section 401. So that particular question would be reviewed de novo by this court. There's nothing in the statute that says they have to be combined. Really? Is it? Section 401 speaks in terms of the State certifying that all discharges associated with an activity will be able to comply with the State's water quality standards. And that is an activity that is authorized by a Federal license. The Federal license at issue in this particular certification is the Certificate of Public Convenience and Necessity issued by FERC. But that still doesn't speak to your argument that they have to be looked at cumulatively rather than separately as the State has done. The statute says that the activities discharges, that is what the State is certifying. Here the activity is the construction of the pipeline as authorized by the FERC certificate, which is the Federal license here that requires a certification. Now, even if the State were allowed to take these certifications of upland impacts and certifications of the crossing impacts in separate proceedings, which petitioners do not necessarily argue was improper, once those discharges are certified and authorized by Nationwide Permit 12, those impacts on water quality become part of the environmental baseline, the reality against which the State had to judge the upland impacts. Here what the State did was look at the upland impacts and look at the crossing impacts as if neither of the others existed. They're looking at them totally in isolation, when the reality is this pipeline will be constructed down very steep slopes in many cases that those slopes directly end at the stream crossings. So during construction, you're going to have significant sedimentation both coming off of the steep slopes and coming from the crossings themselves. So even if they were not required to do one certification, when certifying the upland impacts, they cannot simply ignore the impacts that would occur as a result of the stream crossings. Yet that's what they've done. I'm sorry to interrupt you. I want to go back to the, if you don't mind, to the question I asked you originally about what the process is. As my understanding, construction has already begun. And it's your view that if Virginia goes back and reassesses and agrees with you that there were problems, I'm just unsure what the process is, what the procedure is, because it seems to me we're in no man's land, unknown territory, where there's no precedent for stopping construction to accommodate a change by Virginia, their view of what's needed. Well, Your Honor, FERC certainly has authority to issue a stop work order. And again, without a valid Section 401 certification, the Clean Water Act prevents any activity subject to a Federal license that would lead to a Clean Water Act regulated discharge. But is there a statute or regulation that you can point me to that authorizes that type of action? That is Section 401, Your Honor. Section 717R of the Natural Gas Act authorizes review of State actions implementing Federal law, which is what we are dealing with here. And the remedy for that is a remand to the agency for further proceedings. So this is certainly envisioned by FERC and by Congress, excuse me, that these sort of permitting decisions would be subject to challenge. But if I'm understanding you correctly, it seems to me that these challenges could go on ad infinitum, and that there's never an end to the process. Without a valid certification, construction that would lead to a discharge cannot proceed. So, you know, there are pipelines, I mentioned the Constitution Pipeline in New York, for which FERC has issued Certificates of Public Convenience and Necessity, but for which the State denied the Section 401 certification. And in that case, FERC cannot and has not allowed construction of that pipeline that would lead to discharges. And the same is true here. And again, the ‑‑ I think I understand your answer. Well, this is going to lead to discharges. I mean, you're going to cut trees down to get the swath of the 125, whatever, for clearing construction. I mean, it's clear if you cut down trees, you're going to expose soil to erosion, right? Just like, correct? Because it's going to rain. We hope it's going to rain. I'm pointing to it now, right? Yes, Your Honor. So what do they have to do? What would they have to do? In other words, to say that there won't be any discharge, because it seems to me that there will be. You want to mitigate, obviously, those things. But isn't it necessarily so? You cut down a tree in the forest, and when it rains, you're going to expose soil to more erosion, right? Yes, Your Honor. So what could you do? Have a big tent along the whole? I mean, what would you do? Because, obviously, FERC has said this project has been certified to go forward. It's a public need for natural gas and those things. The pipeline, they want it built. So the question is, how can we protect the environment? How do you propose? What should they have done? I'm not an engineer, Your Honor. I know. And the Court isn't either. That's why there's a lot of deference to people who are engineers and do this thing for a regulatory basis. That's my question. Yes. What we have here, Your Honor, you are correct that the construction of this pipeline would lead to significant sedimentation impacts. I didn't say significant. I said it may seem common sense when you cut down trees, you're going to expose soil to. Right. I mean, that's just common sense. And not only cutting down trees, but also grubbing, pulling out stumps, clearing of all vegetation, and digging of substantial trenches. And we have expert evidence here in the record showing that that activity would lead to substantial increases in erosion and sedimentation. And the State's duty was to determine how those increases in erosion and sedimentation would affect compliance with the State's water quality standards, including anti-degradation requirements. And we have in the record expert reports showing that during construction, sedimentation would increase by 1,500 percent. And we don't have any contrary evidence offered up by the State. Now, the State asked for deference to expertise, to its expertise, but it must demonstrate that expertise in order to be afforded deference. The Court cannot simply defer to a void. And here, the State has not offered any countervailing evidence, quantification of sedimentation with the erosion and sedimentation controls that it has imposed, the general non-site-specific controls included in Mountain Valley's annual standards and specifications. They have not performed the analysis necessary to show that these would not violate water quality standards, and certainly not that there would be no lowering of water quality, which is what is required to satisfy anti-degradation requirements in Tier 2 streams. Now, the State has a guidance document that sets out precisely the methods it's supposed to undertake in order to consider whether there would be a lowering of water quality, which requires establishing by what extent do these waters exceed the bare minimum standards. This is all for the protection of what are called high-quality waters. What is the baseline conditions, how much of that excess water quality would be taken up, and does that constitute a lowering of water quality? And if that's the case, then a full socioeconomic justification is required. Here, the State hasn't followed any of those procedures. It hasn't established the baselines of the streams. It hasn't calculated how much sediment would enter these streams without imposition of sediment controls, and it hasn't calculated how effective the particular controls that it has applied would be in controlling that sediment. You know, without doing that analysis, there's no way the State can rationally conclude that there would be no lowering of water quality. And its reliance on a separate EPA stormwater permit that concluded that erosion and sediment controls in that permit would adequately prevent any lowering of water quality, that reliance is misplaced. EPA there clearly said that that decision would apply in the absence of information demonstrating otherwise. Here, the record very clearly includes information demonstrating otherwise. That is that construction of this project would lead to substantial and long-term increases in sedimentation, and the State has not provided any evidence to countervail. All right. Thank you, Counsel. Mr. Hayden. Good morning, Your Honors, and may it please the Court. Toby Huytens on behalf of the State Respondents. I'd like to make three basic points this morning. First, this petition for review involves a discrete challenge to an important but small portion of an almost exclusively Federal process for authorizing the construction of an interstate natural gas pipeline. Second, it appears undisputed that in this case the State agencies subjected this particular project to both a level and a depth of scrutiny that was at the time unprecedented and involved looking at things that Virginia regulators had never previously looked at. And third, the level of scrutiny applied here is all the more noteworthy because under Federal law, the State agencies were not required to take any action whatsoever in this case, and even a delay, even a delay on the part of the State agencies, would have simply permitted this project to move forward without imposing any of the extensive additional requirements that were imposed in this case. So I'd like to address first, I guess, Judge Traxler's question about what would happen in this case. And I think the question is quite right. It is not entirely clear what would happen regardless of the outcome of this case because FERC has issued the final notice to proceed in this case. And as I read the decisions that have addressed this question, I think what would have to happen is there would have to be a request to FERC to rescind the notice to proceed because I think it's critically important both to our standing argument and to the general argument that we're presenting here today, is that it is not the State agencies that authorize the construction of the pipeline. It's FERC that authorizes the construction of the pipeline. And so if there was a request to FERC to stop the construction of the pipeline, there would be a number of questions about how procedurally that that would be done. There would also be questions, to be candid with the Court, about the timeliness of this entire proceeding, which is an issue that we would certainly take the position has been timely, but there are questions. And under the decisions that I've read of both the Second Circuit and the D.C. Circuit, it seems fairly clear that any questions about the timeliness issue here would be determined under the exclusive jurisdiction of the D.C. Circuit rather than this Court. That was the decision of the Second Circuit. The Constitution Pipeline case and of the D.C. Circuit. So there are serious, in addition to the injury in fact issue that we have identified, there are serious redressability issues as well that go to the issue of Article III standing. Let me then go on just to talk about the standing issue very briefly. Fundamentally, the issue is that Aikens and Towns simply are not the silver bullet that the petitioners think they are in response to our standing argument for two very simple reasons. The first reason is that the language that they rely on from Aikens is squarely and overtly about the second requirement of standing, causation, and the language from Towns in which they rely is squarely and overtly about redressability, the third requirement of standing. The argument that we have made is about the first requirement of standing, injury in fact, and Aikens and Towns simply don't speak to that question. The second reason that Aikens and Towns are not the silver bullet that they're portrayed as is because of a fundamental difference of the situation between those cases and this. In both Aikens and Towns, if the appealing party were to have prevailed, there would have been a change in their legal relationship with the defendant. In Aikens, if the plaintiffs had prevailed, the plaintiffs would have been entitled to receive information from the FEC. In Towns, if the prisoner had prevailed, his legal status as eligible for discretionary parole would have, by operation of this Court's decision, changed. But that's not true here. Even if the petitioners prevailed in this case, there would be no legal change whatsoever in their relationship to the State respondents because at the end of the day, all they are asserting is a pure procedural injury, which the Supreme Court has made very clear is insufficient to support Article III's standing. But let me address the merits as well because there are differences. I'm not saying here, though, that they can stop you from getting 401 certification. Then the train stops on the tracks, and then you have to do something different. That's what they're asserting. Judge Gregory, I do understand that argument, and I would submit with respect that that is a simply incorrect argument because it is undisputed. It is absolutely concededly undisputed that the State agencies would not be required, legally speaking, to do anything in response to a remand order because the State agencies would be allowed as a matter of discretion. And, again, I'm not asserting that they would or wouldn't do this, but they would be legally entitled to waive certification. And that decision would not be subject to judicial review of any sort whatsoever. There's an additional problem, of course, which is, again, raised. There would be, again, and candor to the Court, there would be a question about the timeliness of the review because under Section 401, there's a one-year deadline. Now, again, it would be our view that the State agencies have fully complied, but there would be a question about whether or not the timeliness was satisfied. So I think fundamentally, Chief Judge Gregory, that the petitioners are simply mistaken in the question of whether the State agencies would be required to take any particular legal action, which is what we think distinguishes this case from both Aikens and Towns. Based on this case as it stands now, it seems like the Commonwealth has done anything but suggest that they want to waive because, as you started off, they've done things that are beyond normally and looking at upland and crossings. So it doesn't seem like any indication here in this record that the Commonwealth has gone away. Absolutely, Your Honor, because fundamentally, the State agencies in this case did the opposite of waiving. They subjected this pipeline to a level of scrutiny that is unprecedented in the history of Virginia, and that actually is a nice segue into the first issue. You think of this as either the segmentation or the cumulative impacts, the first argument that the petitioners have pressed on the merits. I think it's important to take a step back and realize that the only reason that this issue even arises at all is because in this case, the State agencies made the then unprecedented decision to consider upland impacts as part of a 401 certification. It appears undisputed that in prior projects before this one, the State agencies did not even look at upland impacts under Section 401, and until they do that, there can't even be a question about combined impacts. And to go back to a question that Judge Thacker raised that I think is quite germane here as well, one will look in vain in either Section 401 or in any previous decision interpreting Section 401, of which I am aware, one will look in vain for any legal obligation under Section 401 to perform the specific type of analysis that the petitioners are asserting is required here. I have not seen such a requirement in any decision, and that's in part because, as I said, in the past State regulators have not even considered upland impacts, and the question of upland impacts simply can't arise unless, excuse me, the question of segmentation or combined impacts simply can't arise until you decide to consider upland impacts in the first place. And the reason for that, I think it's important to emphasize, is the other challenge, and returning to my first point, is 401 certification is critically important. It is a vital part of ensuring that projects comply with environmental and water safety in particular. But it is important to recognize and underscore that it is a portion, and it is a comparatively small portion of the overall process. There was an environmental impact statement that considered the environmental impacts of this entire project. There was extensive analysis by the U.S. Army Corps of Engineers under Section 404 of the Clean Water Act. And so the fact that one particular portion of the overall assessment didn't specifically consider one sort of issue does not mean that that issue was not considered at any one, at any point in this entire project. And now the question might be, why not simply do it here as well? And I think that fundamentally would neglect the standard of review, because it will always be the case. In every case like this, it will always be the case that it would be possible to identify some other additional step that the regulator could potentially have taken. But if that's the standard, then every decision would be arbitrary and capricious, because you will always be able to identify something else that could have been done. So the fact that they have been able to identify something that was not done is not sufficient to demonstrate that it was arbitrary and capricious. I'll turn very briefly to the degradation point, and would be happy if the Court has any further questions on that. Fundamentally on the anti-degradation, I think the way to understand that, or I think the appropriate way to look at that, is that in this case the Virginia regulators once again used the full scope of their regulatory authority and chose to use the tried and true methods of addressing this. Specifically what they did is that's, so to take a step back, broadly speaking, Section 402 of the Clean Water Act regulates construction, sites of larger than an acre. Virginia implements those requirements versus something called the Construction General Permit. That was the permit that was upheld against a challenge in the Kelby case that's cited on pages 52 and 53 of our brief. The challenge for the Virginia regulators' perspective is that 402 of the Clean Water Act says that it does not apply to interstate natural gas pipelines, but the pipelines are in fact covered by Virginia's annual standards and all of the requirements of the Construction General Permit. And so the basic idea here is that this construction project, through an admittedly somewhat multistage level, is subject to all of the traditional requirements for construction sites that Virginia uses to protect water quality. And we simply think that reliance on the tried and true method that has been upheld by the Virginia courts cannot certainly be deemed arbitrary and capricious. But here the question, these are tier two waters and obviously it's high quality. Don't we keep the focus on the main thing? Why wouldn't we want to baseline where these streams are and know what's going to be the impact? That's what petitioners and plaintiffs are talking about. It seems like you don't have a baseline or plan to see what's going to be the sedimentation damage and those kind of things. I certainly understand their argument on the baseline. I think fundamentally the reason that that argument is incorrect is that, first and foremost, this plan has put in place an extensive monitoring program where we will be monitoring, where the waters in these streams will be monitored on a continuous basis, and that will help establish the very baseline that we're concerned about here. This is mentioned at several different places in the Joint Appendix. The most accessible citation, I think,  the State agencies entered into agreement with the U.S. Geological Survey to conduct continuous monitoring of these water qualities to see if it turns out. The prediction is that we're going to use the tried and true method to make sure that there are no significant negative impacts. But we're not just going to assume that that's the case. We're also going to use the tried and true method of continuous monitoring, and if they discover problems, they will address them. So I think that fundamentally addresses the baseline issue, which is relying on the tried and true methods in combination with regular monitoring to see if those assumptions are holding true, and if those indications in the past are holding true. Can I ask you a question? Of course. If we vacated the 401 certificate and remained at the case, and Virginia decided to add some additional conditions, does FERC have to accommodate those conditions? In other words, can you say with confidence that FERC would listen to you and follow your suggestions? Judge Baxter, I want to be careful here. As a representative of the Commonwealth of Virginia and the state agencies, we would certainly take the position that anything that we would do would be in accordance with law, and we would vigorously defend our entitlement to do so. I can't guarantee what the Federal Energy Regulatory Commission would do, I think is the most candid answer that I can give to that question. We certainly would not do anything that we were of the view that we were not legally entitled to do, but I can't predict what others might choose to do. If there are no further questions, we urge that the petition for review be dismissed or, in the alternative, be denied. Thank you. Thank you, Mr. Hager. Mr. Sibley. Good morning. Trey Sibley for the Intervenor Mountain Valley Pipeline. I'd like to start first with Judge Traxler, the questions you posed to counsel for the petitioners regarding the legal obligation for FERC to do anything in the event that the court were to vacate the 401 water quality certification. Mr. Luckett referred you to Section 401 itself. Section 401 is only a condition on the granting of the Federal license or authorization. It does not speak to what happens should, in a subsequent court action, the certification be vacated or set aside. So we're dealing with a gap here, and there is no authority under the Clean Water Act or under FERC's regulations or their authorizing statutes dictating what should happen in this particular case. It is an open question about what a FERC would actually do. I'd like to, staying on the standing question, I'd like to talk. We just want to make sure that 401 certification is a condition proceeding for what to happen. The granting of the authorization. And the authorization here was granted with the certificate and then made effective by the notices to proceed, which had now been issued, and construction has been underway since January to some degree. But this court would say that to vacate that certification, then there is no granting, is there? Well, the FERC's authorization has already been issued, has been granted, and FERC is not a party to this court. It would not be subject to the court's mandate. There would need to be some subsequent action in FERC to affect any of the things that petitioners have cited that give them standing. So you're saying that our order would have no non-proton effect on the first grant? That would be correct, Your Honor. Okay. Do you have a case that you could cite for that? I don't. I didn't think so. This issue has not come up in the context of a 401 certification. And the reason why is because 401 typically doesn't do the authorizing work. It's not the thing that typically creates the injuries that would create standing. And that's the point that Mr. Hytens would make. But it lays out a federalism aspect of it. The State is in the line to protect its waters, streams, and natural resources. And there is no question that Virginia has done that here. And they have taken that step, and they have done it quite robustly. But the question now for us is to decide whether or not they have done it properly. And, therefore, that's what we're here for, right, whether or not these things like degradation studies and the combined, I mean, that's their position. Well, let me, yes, to a certain degree, Your Honor. Let me make this observation. The issue here, Mr. Hytens noted correctly that as part of a 401 water quality certification process, no pipeline project has ever had upland impacts assessed through the 401 process in the way they were assessed here. That is not to say that those impacts are not addressed, have not been addressed previously, through the state law mechanisms that already exist. As we discussed at length in our brief, the MVP, Approved Annual Standard and Specifications, is the result of that state law process. The innovation here by the agency was to take that authorization and effectively incorporate it through the 401 water quality certification. The curious thing here would be is if the court were to vacate the water quality certification, those state controls would still stay in place as a function of state law. All that is at issue here is this certification under Section 401. Petitioners have not challenged, as a matter of state law, the underlying annual standards and specs. In staying in that vein, Judge Gregory, you asked about what should the state have done here, and I would answer that in a question to Mr. Luckett, and I would answer that question by saying they should do exactly what they did. They took their existing approach to dealing with construction-related discharges. This is not the first construction project in the Commonwealth of Virginia. This is not the first big construction project in the Commonwealth of Virginia. The methods for dealing with construction-related discharges from stormwater runoff are tried and true. They're reflected in the Virginia Construction General Permit that applies in most cases, and that same approach has been incorporated through the Mountain Valley Pipeline Standards and Specifications, which are enacted under a different state law due to the curious carve-out within the Clean Water Act for natural gas pipelines. All of those measures are measures with which the DEQ is well familiar. They have a history of working with those. They understand the efficacy, and they have explained that. With respect to anti-degradation, Mr. Luckett referred to a measurement of the baseline, and Judge Gregory, you asked a question about the measurement of baselines. In the context of construction-related discharges, the conclusion of the agency is that there will be no degradation of water quality if these steps are taken. Now those steps are the imposition of what we refer to as best management practices, the physical barriers that keep sediment from reaching water bodies, and then more importantly than that, the extensive requirement to monitor and make sure that those things are working. And if they're not working, the state has the ability to stop work and implement additional controls to protect. That's the system that has been in place for an extended period of time with respect to construction-related discharges more generally. The provisions in the guidance that Mr. Luckett cited relate more narrowly to a really different type of scenario. If the Court is inclined to look at that, that deals with instances where you have something like a pipe discharging into a, conducting regular discharges into a water body, and you're trying to set permit limits on the amount of bad stuff that could reach the water. Here the judgment of the agency is that there will be no incremental increase in the sedimentation, and to the extent there is, it would not be sufficient to trigger a Tier 2 or Tier 3 individualized review. Now that opinion on the part of the state is not novel. It's not new. It's not something they came up with for this case. It's the same approach they've applied historically, and it's the same approach that EPA applies with respect to its construction general permit that are issued under its own authority under the Clean Water Act. Give me one moment to refer to my notes. I think I've made the points I'd like to make. If there are no further questions, we'd ask that the decision of, that the petition be dismissed, either dismissed for lack of standing or denied. Thank you. Thank you, Mr. Sibley. Mr. Luckett, you have some time reserved. So I'll first address the standing arguments where the state attempted to distinguish the case of FEC v. Aikens. That case is contrary to those assertions, is precisely on point here. There the FEC said that even if the court ordered on remand that a particular group be classified as a political committee, such that they would be required to make certain information disclosures that the plaintiffs requested, FEC said on remand they could exercise their discretion not to require those disclosures. That is perfectly analogous with what we have here, where they have taken an affirmative action, but say on remand they could exercise their discretion to waive their authority. And again, as this court stated in Townsville-Jarvis, denying standing in that situation would be inviting the court to wade in to the difficult, if not impossible, task of trying to predict how an agency would exercise its discretion. And you were saying in Towns that was sufficient to establish injury in fact. At least Towns discussed the question in terms of the redressability prong. Here, no one denies that, none of the parties deny that construction of this project could not go forward without a certification or affirmative waiver of that certification, and that this construction would cause injury in fact to petitioner's members. Now, the State has made much of how this level of review was unprecedented, looking at these upland discharges. But DEQ, in their certification and in their guidance, clearly acknowledges that this level of scrutiny is required for a legally compliant 401 certification. These are discharges associated with the activity of constructing the Mountain Valley Pipeline. And here, the State has made an affirmative statement that they have a reasonable assurance that this activity, construction of the pipeline, would not lead to violations of water quality standards. And that is the decision that is under review. Was that a rational determination that this project would not lead to violations of water quality standards? The fact that in previous proceedings they may have failed to account for all the discharges associated with a project when conducting a 401 certification does not mean that they are not required to do so here. Indeed, they have said that these are discharges resulting from that activity. And under 401, that is what a certification covers, is all of the discharges resulting from the activity authorized by the Federal license. And here, the State failed to account for the combined discharges, combined impacts of the upland discharges and the discharges associated with water body crossings. Now, the State here and Mountain Valley as well have said that a real investigation of how effective these measures would be is not required because they are going to do monitoring after the project is already being built. And they say if they are not working, that the State can require additional and different protections. But what not working means is a violation of water quality standards. And that's specifically what the State here has said will not happen. So on the one hand, the State is saying there will be no violations of water quality standards. On the other hand, they're saying, court, don't worry that we haven't really assessed the effectiveness of these control measures because if they don't work and cause violations of water quality standards, we'll require more and different ones. Now, we don't know what more and different ones would in fact be protective of water quality in the future. Again, the State has simply failed to undertake its duty in this proceeding to make a determination whether it has reasonable assurance that this project can comply with water quality standards. And they can't shift this burden off to FERC or the Army Corps of Engineers by arguing that they are only a small part of this decision. Neither FERC nor the Army Corps of Engineers makes a determination that water quality standards will be protected during construction of this project. And in terms of the effect of this court's order, Natural Gas Act, Section 717R, states that these decisions are reviewable in the U.S. Court of Appeals and that if a decision is found legally deficient, it should be remanded to the agency for further proceedings. Now, Mr. Sibley for Mountain Valley basically argued that this court's decision would have no effect. Petitioners in that case would be left with a right without a remedy and that cannot be what Congress intended in the Natural Gas Act. Now, because the State failed to rationally conclude that this project would not cause a violation of water quality standards, the Court should vacate the certification and remand to the State for further proceedings. Thank you. Thank you, Mr. Luckett. We'll come down to Greek Council and proceed to our final case for today.
judges: Roger L. Gregory, William B. Traxler Jr., Stephanie D. Thacker